COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP
Jeffrey W. Herrmann
Audra DePaolo
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Telephone: (201) 845-9600

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JENNIFER BENNETT, DIANA DANNELLY, EDIE GOLIKOV, DOLORES HERRMANN, LONNIE HODGES JR., LILY MARTYN, RYSZARD POJAWIS, STEPHEN TIMM, and LIANG YU, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> QUEST DIAGNOSTICS, INC, <br><br> Defendant. | Civil Action No. _____ <br><br> **CLASS ACTION COMPLAINT** <br><br> JURY TRIAL REQUESTED |

Plaintiffs Jennifer Bennett, Diana Dannelly, Edie Golikov, Dolores Herrmann, Lonnie Hodges Jr., Lily Martyn, Ryszard Pojawis, Stephen Timm, and Liang Yu (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, bring this complaint against Quest Diagnostics, Inc. ("Quest"). Plaintiffs' allegations are based upon information and belief, including the investigation of counsel, except as to the allegations that pertain to Plaintiffs, which are based on their personal knowledge.

### INTRODUCTION

1.    This is a class action on behalf of a national class defined as all persons who

were charged fees for services by Quest that were in excess of the negotiated or mandated fair market value rates established for those services between Quest and private or public insurers (the "Class").

2.      Quest is the largest U.S. laboratory engaged in the business of providing laboratory testing services to patients.  Quest provides over 100 million laboratory tests for patients each year.

3.      The United States is undergoing a healthcare crisis.  Healthcare recipients are increasingly being required to absorb greater costs for healthcare, through higher insurance premiums, copays, deductibles, and exclusions.

4.      This action addresses a particularly pernicious business practice of defendant Quest.  Specifically, Quest maintains a price list of diagnostic lab tests that is grossly disproportionate to the negotiated or mandated fair market value rates Quest charges third-party payers, such as private and public healthcare insurers ("Benefit Plans").  When a Benefit Plan refuses to cover Quest's diagnostic lab tests, or when the patient lacks insurance, Quest overbills the patient at the excessive list prices (or "chargemaster rates") that bear no relationship to fair market value rates, but rather may range from four to twenty times greater than fair market value rates.

5.      For example, each Plaintiff was charged an exorbitant amount in excess of what they or a Benefit Plan would have paid for the exact same service(s) if the service(s) had been covered by a Benefit Plan:

   a.      Jennifer Bennett was billed $58.41 for an "Allergen Specific IGG" performed on behalf of her son, Jeremiah Bennett.  Had Bennett's insurer (Aetna) covered the cost of the test, Quest would have recovered $5.02, or about 8.6% of its chargemaster rate.

   b.      Diana Dannelly was billed $1,902.19 by Quest for a series of 17 lab tests.  Under the Clinical Laboratory Fee Schedule ("CLFS"), which lists the reimbursement

rates for various laboratory tests covered by Medicare/Medicaid, Quest would have recovered $309.97, or 16.3% of Quest's chargemaster rate.

c.  Edie Golikov was billed $477.68 by Quest for two lab tests (CPT code[1] 86301 and 81291).  Under the CLFS, Quest would have recovered a total of $87.81, or 18.38% of Quest's aggregate chargemaster rates.

d.  Dolores Herrmann was billed $71.39 for a single lab test (CPT code 83036).  Under the CLFS, Quest would have recovered $13.22, or about 18.52% of Quest's chargemaster rate.

e.  Lonnie Hodges Jr. was billed $981.54 for a series of 10 lab tests.  Under the CLFS, Quest would have recovered $264.69, or about 25.9% of Quest's chargemaster rates.

f.  Lily Martyn was billed 123.51 by Quest for a single lab test (CPT code 86161).  Under the CLFS, Quest would have recovered $16.35, or 13.24% of Quest's chargemaster rate.

g.  Ryszard Pojawis's wife was billed $316.20 for a single lab test (CPT code 81291) performed on behalf of their daughter.  Under the 2016 CLFS, Quest would have recovered $59.46, or about 18.8% of Quest's chargemaster rate.

h.  Stephen Timm was billed $168.24 for a single lab test (CPT code 86001).  Under the CLFS, Quest would have recovered $7.16, or about 4.26% of Quest's chargemaster rate.

i.  Liang Yu was billed $499.44 by Quest for four lab services.  Under the CLFS, Quest would have recovered $142.02, or 28.44% of Quest's chargemaster rates.

6.  Postings on the internet are replete with stories from Quest's patients who were denied insurance coverage and were overbilled by Quest (similar to the allegations here on behalf of Plaintiffs).

7.  Additionally, Plaintiffs had no agreements with Quest to pay these excessive chargemaster rates and were frequently not even aware that their lab tests were being performed by Quest.  In the absence of any agreement to pay excessive chargemaster rates, Quest's only remedy is in *quantum meruit*, to be paid the reasonable, fair market value rates.

---

[1] "CPT code" means Current Procedural Terminology code, and is a commonly used medical test identification system maintained by the American Medical Association.

8.    Compounding Quest's overbilling, Quest customarily issues invoices to patients (including plaintiffs) that are intentionally misleading.  Specifically, although Quest's invoices customarily state the chargemaster rates per test for multiple tests, they only contain (i) the aggregate third-party payments or discounts for multiple lab tests, and (ii) the aggregate copays or deductibles or other amounts billed directly to patients.

9.    Patients are not informed by Quest what, if any, insurance discounts or insurance payments are being applied to each lab test, and what amounts patients are billed as a copay or deductible for each lab test.

10.    Nor does Quest inform patients (a) whether certain tests were disallowed by their insurer, or (b) that patients are being required by Quest to pay Quest's non-market based excessive chargemaster rates for those tests, rather than negotiated fair market value rates. Further, Quest fails to disclose to patients the fair market value rates for those excluded tests that had been negotiated or established at arm's-length with Benefit Plans.

11.    Quest compounds its misconduct by turning invoices over to credit agencies for collection when class members refuse to pay Quest's excessive chargemaster rates.

12.    This action seeks recovery by Plaintiffs on behalf of the Class of amounts paid by patients to Quest in excess of fair market value rates, and a declaration that Plaintiffs and members of the Class only owe Quest those amounts reflected by fair market value rates.  A fair market value rate for these purposes is defined as "the price that would be agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts."  *See* IRS Publication 561.  In the event there is no fair market value rate already established for a particular Quest service by arm's-length agreement between Quest and class members' Benefit Plans, a fair market value rate can be determined based on a

reasonable percentile of the amounts actually received by Quest from customers and Benefit Plans for its services.

13.     This action also seeks transparency in the manner in which Quest bills patients, and specifically requests an order directing Quest to bill patients on an individual, itemized, test-by-test basis, rather than on an aggregate basis.

14.     This action is related to *Leslie v. Quest Diagnostics, Inc.,* Civil Action No. 17-01590 (ES) (MAH) (D.N.J.) (filed March 8, 2017).

15.     The *Leslie* Complaint was filed on behalf of the same proposed Class consisting of "all persons who were charged fees for services by Quest that were in excess of the negotiated or mandated fair market value rates established for those services between Quest and private or public health insurers."

16.     Quest filed a motion to dismiss the *Leslie* Complaint on May 26, 2017.  The *Leslie* parties have completed briefing on that motion, which has been submitted for decision.

17.     Subsequent to the filing of the *Leslie* Complaint, Plaintiffs' counsel was retained by the Plaintiffs herein to file related claims against Quest.

18.     This Complaint is intended merely as a placeholder complaint to toll the running of the statute of limitations.  Plaintiffs are agreeable to staying Quest's time to respond to this Complaint until after the determination of the defendant's pending motion to dismiss in *Leslie*. Plaintiffs, at that time, anticipate filing a consolidated, amended complaint.  Filing this *Bennett* Complaint at this time will not cause any prejudice to defendants or improper delay in the prosecution of this action and will keep the applicable statutes of limitations with respect to Plaintiffs' claims from running without disrupting the briefing and determination of the pending motion to dismiss in *Leslie*.

## JURISDICTION AND VENUE

19.    Plaintiffs invoke the subject matter jurisdiction of this Court pursuant to 28

U.S.C. §1332(d), which confers original jurisdiction upon this Court over this class action based

on diversity of citizenship: (a) there are 100 or more Class members; (b) the matter in

controversy exceeds the sum of $5,000,000, exclusive of interest and costs; and (c) at least one

Plaintiff and member of the Class is a citizen of a state different from the Defendant.

20.    This Court also has supplemental jurisdiction over Plaintiffs' state law and

common law claims pursuant to 28 U.S.C. §1367(a).

21.    This Court possesses personal jurisdiction over the Defendant based on Quest's

residence, presence, transaction of business and contacts within this District.

22.    Venue is proper in this District pursuant to 28 U.S.C. §1391 because Quest

maintains its principal place of business in this District, and at all times conducted substantial

business in this District.

## PARTIES

**Plaintiffs**

23.    Jennifer Bennett maintains her primary residence in Illinois, where the lab tests

at issue were conducted.  At all times relevant hereto, Bennett and her son maintained health

insurance through Aetna.

24.    Diana Dannelly maintains her primary residence in Colorado, where the lab tests

at issue were conducted.  At all times relevant hereto, Dannelly was uninsured.

25.    Edie Golikov maintains her primary residence in California, where the lab tests

at issue were conducted.  At all times relevant hereto, Golikov maintained health insurance

through Aetna.

26.     Dolores Herrmann maintains her primary residence in Pennsylvania, where the lab tests at issue were conducted.  At all times relevant hereto, Herrmann maintained health insurance through Medicare.

27.     Lonnie Hodges Jr. maintains his primary residence in California.  At the time he had the laboratory tests at issue performed by Quest, he did not have a permanent place of residence and had the tests performed in Pennsylvania.  At all times relevant hereto, Hodges maintained health insurance through UnitedHealthcare.

28.     Lily Martyn maintains her primary residence in New York.  The lab services at issue were performed for Martyn in North Carolina, which was her primary place of residence at that time.  At all relevant times hereto, Martyn was uninsured.

29.     Ryszard Pojawis maintains his primary residence in Connecticut, which is also where the lab tests at issue were conducted.  Mr. Pojawis is proceeding on his claims against Quest individually and as assignee of any claims belonging to his wife, Teresa Pojawis.  At all times relevant hereto, Pojawis, his wife, and his daughter maintained health insurance through Anthem BlueCross BlueShield.

30.     Stephen Timm maintains his primary residence in California.  At all times relevant hereto, Timm maintained health insurance through Anthem Blue Cross and Blue Shield ("Anthem").

31.     Liang Yu maintains her primary residence in Massachusetts.  At all times relevant hereto, Yu maintained health insurance through BlueCross BlueShield of Massachusetts ("BCBS of Massachusetts").

**Quest**

32.    Quest is a Delaware corporation with its principal place of business and headquarters located at Three Giralda Farms, Madison, NJ 07940.  Quest is the largest provider of diagnostic and clinical testing in the United States.  Quest owns or operates over 2000 patient service centers.  Quest's net revenue in 2016 was $7.52 billion.

33.    Quest is the parent company of numerous subsidiaries that provide laboratory testing, patient billing and related services.

## FACTUAL ALLEGATIONS

**Quest's Laboratory Testing Business**

34.    Quest is engaged in the business of providing laboratory testing services to or on behalf of individuals, doctors, hospitals, health insurers, and other healthcare facilities nationwide.  Quest has operations in every major metropolitan city in the United States.  Quest serves "approximately one-third of the adult population of the United States annually, and approximately one-half of the adult population of the United States over a three-year period."

Quest 2016 Form 10-K ("10-K") at 11.

35.    Each lab test in the United States has a unique five-digit CPT code, commonly used for billing purposes.

36.    A large majority of the laboratory tests performed by Quest are completed on behalf of patients covered by Benefit Plans.  In accordance with those Benefit Plans, private health insurers, employee organizations and others sign agreements with Quest for Quest to provide laboratory testing and other health-related services to participants and beneficiaries of their Benefit Plans.  Quest also performs medical testing on patients covered by Medicare or Medicaid, federal and state governmental insurance programs designed to provide health

insurance to seniors, the disabled, and the economically disadvantaged.

37.    As explained in Quest's Form 10-K (at 21), "[h]ealth plans and [independent physician associations] often require that diagnostic information services providers accept discounted fee structures…."

38.    Quest's agreements with Benefit Plans are an important inducement to encourage patients to have their laboratory tests performed by Quest.  Quest successfully induces customers to do business with them by entering into agreements with Benefit Plans, notwithstanding that those Benefit Plans may subsequently deny coverage.

39.    The rates negotiated between Quest and Benefit Plans, or accepted by Quest, are fair market value rates – the price agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts.

40.    Quest also maintains chargemaster rates for each laboratory test.  Quest's chargemaster rates are well beyond the fair market value rates paid by Benefit Plans.  Quest's chargemaster rates are commercially unreasonable, and when billed to customers, take advantage of Plaintiffs' and Class members' lack of information and bargaining power.

41.    According to the 10-K (at 32), "[g]overnment payers and third parties, including health plans, are taking steps to reduce utilization of, and reimbursement for, some new and innovative healthcare solutions, including new tests and other solutions that we may offer."

42.    To limit their own costs, Benefit Plans at times deny patients coverage of lab tests because, for example, the Benefit Plans consider that the lab tests are either "experimental," "obsolete" or "not medically necessary."

43.    Plaintiffs did not have agreements with Quest on the amount of fees charged and frequently did not know that Quest was the laboratory company performing the diagnostic tests.

44.    When a patient lacks coverage or their insurer denies coverage, Quest insists that the patients pay the commercially unreasonable chargemaster rates, rather than the negotiated or government-mandated fair market value rates established on their behalf by their respective Benefit Plans.  For example, Plaintiffs' Quest invoices required payment of Quest's excessive chargemaster rates, rather than the lower rates negotiated between Quest and Benefit Plans.

45.    Chargemaster rates are not moderate ten or twenty percent premiums to negotiated rates to compensate Quest for the inconvenience of billing customers rather than insurers, but are customarily four to twenty times the fair market value rates charged to Benefit Plans.

46.    Even with respect to services provided by Quest that are covered by Benefit Plans and for which Quest charges fair market value rates, Quest bills the customer and assumes payment risk for copays and deductibles.  Deductibles, specifically, may be equal to the entire allowed claim under a Benefit Plan.

47.    Thus, Quest has no justification for inflating its rates four to twenty times above fair market value rates just for the inconvenience of billing the customer.

48.    Quest has previously been charged with similar misconduct.  In 2011, Quest entered into a $241 million settlement to end a lawsuit by the State of California alleging that Quest had charged Medi-Cal, California's medical program for the poor, higher rates for diagnostic services than Quest had charged private insurers.  *See* Case No. CIV 450691 (Sup. Ct. Cal. San Mateo Cnty).

49.    Quest is not willing to negotiate rates with Class members for lab tests that are not covered by insurance.  Instead, Quest mails multiple copies of invoices and threatening letters to patients over a period of months demanding payment, wrongfully claiming

delinquency, threatening to add the individuals to delinquency lists, threatening debt collection, and threatening legal action and liability for costs and expenses.

50.     Quest has specifically rejected Plaintiffs' efforts to negotiate their outstanding Quest invoices.

51.     Quest follows through on its threats to use outside debt collection agencies to collect and attempt to collect debts from individuals.  Worse still, Quest or the debt collectors often impose a "collection fee" or "assessment fee" of approximately $10 for each invoice when Quest employs the use of outside debt collectors.

52.     As a result of Quest's overbilling, Quest demands, attempts to collect, and often receives payments from individuals far in excess of the reasonable fair market value of Quest's services.

53.     Under Medicare/Medicaid, outpatient clinical laboratory services are paid based on the CLFS (defined above).  In 2014, Congress passed the Protecting Access to Medicare Act ("PAMA"), which includes the most extensive reform of the CLFS since it was established in 1984.  Under PAMA, beginning in 2017, most rates for laboratory services on the CLFS are derived using the weighted median private payer rates, net of discounts, rebates, coupons and other price concessions, which reflect the scope of prices paid across the laboratory industry (subject to certain phase-in limitations on test price reductions during the first several years of implementation).  Quest is not obligated to participate in Medicare, and by doing so acknowledges that Medicare's reimbursement rates are reasonable and approximate fair market value.

54.     Indeed, because Medicare is a Benefit Plan with mandated rates accepted by Quest, and Medicare publicly discloses its maximum payment amount for laboratory services

(private Benefit Plans, such as Aetna, do not), Medicare serves as a reasonable proxy for what other insurers, such as Aetna, would pay had they covered a laboratory service.

55.    Quest also makes it as difficult as possible for patients to understand their bills. Quest aggregates all charges and insurance reductions and reimbursements, and identifies an aggregate balance that is due from the patient.  The patient cannot determine, based on the Quest invoice, whether the amounts due from the patient are co-pays, deductibles, or excessive charges based on tests that were disallowed by Benefit Plans.

56.    This is in direct contrast to Quest's representations in its Form 10-K (at 4, 6, 7, 12, 17, 18, 23, 35, and 59) that it provides "transparency" to patients in billing.

57.    The New York Times' Tina Rosenberg criticized health providers' cryptic billing practices, pointing out that "[u]nlike everything else we buy, when we purchase a medical treatment, surgery or diagnostic test, we buy blind.  We do not know the cost of health procedures before we buy.  When we do get the bill, we have no idea what the charges are based on and have no way to evaluate them."  This ability to "hide the ball" has resulted in unfairly inflated chargemaster rates (or "prices" when discussing hospital services).  "Chargemaster prices are set by the hospital alone and reflect what the hospital would like you to pay.  They are the basis for calculating the discounts given to insurers, and they are generally what's billed to people without insurance.  These charges are commonly three times the Medicare price or more, but The Times reported that in the CMS [Centers for Medicare & Medicaid Services] data, some hospitals charged 10 or 20 times the Medicare price."  An example of the variation, "[t]he average charge for a joint replacement at a hospital in Ada, Okla., was $5,300.  The comparable charge in Monterey Park, Calif., was $223,000."  Tina Rosenberg, *Revealing a Health Care Secret: The Price*, THE NEW YORK TIMES (July 31, 2013).

58.     Finally, to ensure it receives payment, Quest at times insists patients provide credit or debit card information in advance of services, enabling Quest to charge patients for any outstanding balances remaining after an insurance claim has been processed, and leaving patients without any recourse with respect to excessive charges.

59.     Lab testing is not a well-known commodity and Plaintiffs are not reasonably charged with knowledge of Quest's chargemaster rates.

**Plaintiffs' Claims**

**Jennifer Bennett (Illinois)**

60.     At all relevant times hereto, Plaintiff Jennifer Bennett and her son maintained health insurance through Aetna.

61.     On November 28, 2014, Bennett's son had blood drawn at a Quest facility for the purposes of laboratory testing.

62.     Quest and Bennett had not reached any agreement in advance with respect to the fees to be charged for any tests not covered by Aetna.  Rather, Bennett reasonably assumed that the procedures would be covered by insurances, and, at worst, that Quest would charge fair market value rates for any uncovered services.

63.     Quest billed Bennett its inflated chargemaster rate of $58.41 for a single laboratory test not covered by Aetna – an "Allergen Specific IGG" test.

64.     Based on the rate disclosed by Aetna in its explanation of benefits related to the allergy test, Quest would have been compensated only $5.02, or 8.6% of the chargemaster rate, had Aetna covered the test.  Regardless of the fact that Aetna would have paid an amount substantially less than Quest's chargemaster rate, Quest demanded Bennett pay the full chargemaster rate of $58.41.

65.     Bennett, under protest, paid Quest's chargemaster rate in its entirety.

66.     Aetna did, however, cover an "Allergen Specific LGE" test performed on behalf of her dependent son on the same day, which had an aggregate chargemaster rate of $1,003.84; however, Aetna compensated Quest only $160.64 for this test, or about 16% of Quest's chargemaster rate.

### Diana Dannelly (California)

67.     At all relevant times hereto, Plaintiff Diana Dannelly was uninsured.

68.     On August 24, 2016, Dannelly had blood drawn at a Quest facility.  She was not provided any rates in advance of Quest performing laboratory services.

69.     Quest and Dannelly had not reached any agreement in advance with respect to the fees to be charged for any of Quest's laboratory services.  Rather, Dannelly reasonably assumed that, at worst, Quest would charge fair market value rates for its tests.

70.     Quest billed Dannelly its inflated chargemaster rates for its services, demanding payment of $1,902.19 for seventeen laboratory tests performed on August 24, 2016.

71.     Because Dannelly was uninsured, she was responsible for the entire amount owed to Quest for the seventeen tests it performed.

72.     Under the 2016 CLFS, Quest would have received only $309.97 for the same lab services, or about 16.3% of its aggregate chargemaster rate, had Dannelly been covered by Medicare.  The chart below demonstrates the egregious discrepancy between what Dannelly was charged and what Quest would have received from Medicare for the exact same lab services:

| CPT Code | Quest's Chargemaster Rate | 2016 CLFS Maximum Payment Amount |
|---|---|---|
| 82465 | $ 36.77 | $ 5.92 |
| 82627 | $ 205.50 | $ 30.29 |
| 82746 | $ 113.57 | $ 20.03 |
| 83718 | $ 63.81 | $ 11.16 |
| 84439 | $ 140.61 | $ 12.28 |
| 84478 | $ 41.10 | $ 7.83 |
| 84443 | $ 125.47 | $ 22.89 |
| 82607 | $ 115.73 | $ 20.54 |
| 36415 | $ 20.55 | $ - |
| 82172 | $ 25.00 | $ 21.11 |
| 85025 | $ 40.56 | $ 10.59 |
| 86141 | $ 50.00 | $ 17.63 |
| 80053 | $ 62.58 | $ 14.39 |
| 84305 | $ 192.52 | $ 28.96 |
| 82306 | $ 232.54 | $ 40.33 |
| 83090 | $ 218.48 | $ 22.95 |
| 84481 | $ 217.40 | $ 23.07 |
| **TOTALS** | **$ 1,902.19** | **$ 309.97** |

73.     Moreover, Dannelly's doctor's office advised her that Quest would have billed them $430 for the same services.  Thereafter, on two separate occasions, Dannelly offered to pay Quest the $430 directly; however, Quest refused to accept the $430 as payment-in-full and continued demanding payment of its egregious chargemaster rates.

74.     Absent an agreement with Quest, Dannelly has not yet paid Quest for its laboratory services and continues to be subjected to Quest's debt collection practices, including referral to the American Medical Collection Agency.

**Edie Golikov (California)**

75.     At all relevant times, Edie Golikov maintained health insurance through Aetna.

76.     On December 1, 2015, and November 1, 2016, Golikov had blood drawn at a

Quest facility using her Aetna insurance card.

77.    Quest and Golikov had not reached any agreement in advance with respect to the fees to be charged for any tests not covered by Aetna.  Rather, Golikov reasonably assumed that her procedures would be covered by insurance, and, at worst, that Quest would charge fair market value rates for any uncovered services.

78.    Quest billed Golikov its inflated chargemaster rates of $140.61 for a "CA 19-9" test (CPT code 86301) performed on December 1, 2015, and $337.07 for a "MTHFR CMN Variants" test (CPT code 81291) performed on November 1, 2016, neither of which were covered by Aetna.

79.    Quest demanded Golikov pay its full chargemaster rate for each test not covered by Aetna.  For example, on November 1, 2016, Quest demanded Golikov pay the $140.61 for the services performed on December 1, 2015, or else Quest would not perform any services on her behalf.

80.    Had Aetna covered the two tests, it would have paid substantially less than the chargemaster rates.  For example, had Medicare covered the tests, under the 2016 CLFS, Quest would have been compensated only $28.35 for the CPT code 86301 test, and $59.46 for the CPT code 81291 test.  The maximum Medicare reimbursement of $87.81 is equal to 18.38% of the $477.68 aggregate chargemaster rate Quest demanded Golikov pay.

81.    Golikov, under protest, paid the December 1, 2015 bill in its entirety, and has paid Quest $59.46 for the November 2016 test.  Quest has refused to accept the $59.46 as payment-in-full and continues to demand further payment in the amount of $277.61 for its services.

82.    Aetna did cover seventeen laboratory tests performed on Golikov's behalf on

December 1, 2015, which had an aggregate chargemaster rate of $1,292.76. Quest accepted

$172.88 for those services, or 13.37% of the aggregate chargemaster rate.

83.    Aetna also covered eleven tests performed on Golikov's behalf on November 1,

2016, which had an aggregate chargemaster rate of $1,140.49.  Quest accepted $176.87 for

those services, or 15.51% of the aggregate chargemaster rate.

84.    In sum, the aggregate chargemaster rate for the twenty-eight tests Aetna covered

on behalf of Golikov was $2,433.25.  Quest accepted $349.75 from Aetna, or 14.37%, of the

aggregate chargemaster rate.

85.    Additionally, Quest billed Golikov in the aggregate, without a breakdown of

reimbursements from her Benefit Plan for each individual diagnostic test, although Quest was

reimbursed by Aetna on an individual test-by-test basis.  For example, Golikov's Quest invoice

included the chargemaster rate for each line item, but only the aggregate "Insurance Discount"

and "Insurance Paid" amounts.  The failure to disclose the actual amount paid for each line item

concealed the fact that Golikov was actually being charged an excessive rate for a single test not

covered by Aetna, while Aetna paid substantially reduced rates, *i.e.*, the fair market value, for

the tests it did cover.

**Dolores Herrmann (Pennsylvania)**

86.    At all relevant times hereto, Plaintiff Dolores Herrmann maintained health

insurance through Medicare.

87.    On April 17, 2014, Herrmann had blood drawn at a Quest facility.  Quest

subsequently performed laboratory services.

88.    Herrmann reasonably assumed that the diagnostic tests would be covered by

Medicare, and, at worst, that Quest would charge fair market value rates for any tests not

covered by Medicare.

89.    Quest billed Herrmann its chargemaster rate of $71.39 for a single laboratory test that Medicare did not cover—a "Hemoglobin, Glycosylated" test (CPT code 83036)—rather than the fair market value of its services.

90.    Had Medicare covered the CPT code 83036 test, it would have paid an amount substantially less than the chargemaster rate.  For example, under the 2016 CLFS, Quest would have been compensated only $13.22, or about 18.52% of its chargemaster rate, had Medicare covered the test.

91.    Herrmann, under protest, paid Quest's chargemaster rate in its entirety.

92.    Medicare did cover nine other laboratory tests Quest performed on behalf of Herrmann on April 17, 2014, which had an aggregate chargemaster rate of $499.  Of the aggregate chargemaster rate, Quest accepted $69.95 from Medicare, or about 14.3% of Quest's chargemaster rate.

93.    Additionally, Quest billed Herrmann in the aggregate, without a breakdown of reimbursements from her Benefit Plan for each individual diagnostic test, although Quest was reimbursed by Medicare on an individual test-by-test basis.  For example, Herrmann's Quest invoice included the chargemaster rate for each line item, but only the aggregate "Insurance Discount" and "Medicare/Medicaid Paid" amounts.  The failure to disclose the actual amount paid for each line item concealed the fact that Herrmann was actually being charged an excessive rate for a single test not covered by Medicare, while Medicare paid substantially reduced rates, *i.e.*, the fair market value, for the tests it did cover.

**Lonnie Hodges Jr.** **(Pennsylvania)**

94.    At all relevant times hereto, Plaintiff Lonnie Hodges maintained health insurance

through UnitedHealthcare.

95.    On July 12, 2016, Hodges elected to have nine diagnostic tests performed at a Quest location in California through an online website stdtestexpress.com ("stdexpress").

96.    Hodges elected to be billed for those diagnostic tests through stdexpress.

97.    Stdexpress billed Hodges $65.00 for physician's services, $134.24 for patient management support services, and $49.74 for Quest's diagnostic tests.

98.    The $49.74 was the negotiated rate between Quest and stdexpress passed along to Hodges.

99.    On March 15, 2017, Hodges had ten diagnostic tests performed through stdexpress, this time at a Quest facility in Pennsylvania, but rather than electing to have Quest bill stdexpress directly, he had Quest bill his insurance company (UnitedHealthcare).

100.    UnitedHealthcare, however, disclaimed coverage and Quest billed Hodges $1,021.54.  Excluding the CPT Code 97661 from the tests performed in March 15, 2017 (because that test was not performed in July 2016),  Quest billed Hodges $848.31 in March 2017 for the same tests that Quest billed Hodges $49.74 in July 2016 – a 17.1 times mark-up. There is no rationale for Hodges to pay a different rate because the 2016 invoice was paid through a third party website rather than attempting in March 2017 to pay the bill through his insurer.

101.    Quest and Hodges had not reached any agreement in advance with respect to the fees to be charged for any excluded tests.  Rather, Hodges reasonably assumed that, at worst, Quest would charge fair market value rates for any tests not covered by his insurance.

102.    Had UnitedHealthcare covered the ten laboratory tests, it would have paid an amount substantially less than Quest's chargemaster rates.  For example, under the 2017 CLFS,

Quest would have been compensated only $264.69, or about 25.91% of its chargemaster rates, had Medicare covered the ten tests performed in March 2017.

103.    The egregious disparity between Quest's chargemaster rates and Medicare's reimbursement rate, as well as Hodges's previous payment amount, is demonstrated by reference to the nine overlapping tests that were performed in both March 2017 and July 2016 in the chart below:

| CPT Code | Quest's Chargemaster Rate (03/15/2017) | 2017 CLFS Maximum Payment Amount | 2016 Self Pay Rate (07/12/2016) |
|---|---|---|---|
| 87340 | $ 84.36 | $ 14.17 | $ 3.50 |
| 36415 | $ 21.37 | $ 3.00 | $ 3.50 |
| 86695 | $ 107.14 | $ 18.09 | $ 2.87 |
| 86696 | $ 136.96 | $ 26.55 | $ 2.87 |
| 86803 | $ 145.11 | $ 19.57 | $ 6.00 |
| 87491 | $ 103.49 | $ 48.14 | $ 10.00 |
| 87591 | $ 103.48 | $ 48.14 | $ 10.00 |
| 86592 | $ 38.24 | $ 5.86 | $ 2.00 |
| 87389 | $ 108.16 | $ 33.03 | $ 9.00 |
| **TOTALS** | **$ 848.31** | **$ 216.55** | **$ 49.74** |

104.    Hodges sought unsuccessfully to negotiate his March 15, 2017 invoice with Quest.  On August 5, 2017, Hodges paid Quest the full amount demanded pursuant to his March 15th invoice to avoid any further collection attempts and damage to his credit rating.

**Lily Martyn (North Carolina)**

105.    At all relevant times, Lily Martyn was uninsured.

106.    On September 19, 2016, Martyn had blood drawn at her doctor's office for purposes of laboratory testing.  The laboratory services were subsequently performed by Quest.

107.    Quest and Martyn had not reached any agreement in advance with respect to the fees to be charged for any of Quest's laboratory services.  Rather, Martyn reasonably assumed

that, at worst, Quest would charge fair market value rates for its services.

108.    In fact, Martyn did not know that the lab tests were being performed by Quest, as opposed to some other lab company.

109.    Quest billed Martyn its inflated chargemaster rate rather than the fair market value of its services, demanding payment of $123.51 for a single laboratory test – a "Comp, Functional Act" test (CPT code 86161).

110.    Because Martyn was uninsured, she was responsible for the entire amount owed to Quest.

111.    Indeed, had Martyn been covered by Medicare, under the 2016 CLFS, Quest would have received only $16.35 for the same lab services, or about 13.24% of Quest's chargemaster rate.

112.    On February 4, 2017, Martyn's father, Byron Martyn, under protest, paid the full $123.51 on behalf of Martyn.

**Ryszard Pojawis (Connecticut)**

113.    At all relevant times hereto, Plaintiff Ryszard Pojawis, his wife (Teresa) and his daughter (Anna) maintained health insurance through Anthem BlueCross BlueShield ("Anthem").[2]

114.    On April 9, 2013, Pojawis's daughter had blood drawn at a Quest facility.  Quest subsequently performed laboratory services.

115.    At all relevant times, Pojawis's daughter was his dependent, and therefore

---

[2] The Anthem plan was obtained through Teresa's employer.  As a result, Teresa was identified as the responsible party on the Quest invoice at issue.  Nevertheless, Mr. Pojawis is bringing this claim individually and as assignee of any claim Teresa may have related to the Quest invoice at issue here.

Pojawis and his wife were responsible for the payment of any of Anna's laboratory services that were not covered by Anthem.

116.    Pojawis reasonably assumed that the diagnostic tests would be covered by Anthem, and, at worst, that Quest would charge fair market value rates for any tests not covered by Anthem.

117.    Quest billed Pojawis its chargemaster rate of $316.20 for a single laboratory test that Anthem did not cover—a "MTHFR CMN VARIANTS" test (CPT code 81291)—rather than the fair market value of its services.

118.    Had Anthem covered the CPT code 81291 test, it would have paid an amount substantially less than the chargemaster rate.  For example, under the 2016 CLFS, Quest would have been compensated only $59.46, or about 18.8% of its chargemaster rate, had Medicare covered the test.

119.    Pojawis, under protest, paid Quest's chargemaster rate in its entirety.

120.    Anthem did cover ten other laboratory services Quest performed on behalf of Anna on April 9, 2013, which had an aggregate chargemaster rate of $2,232.88.  Of the aggregate chargemaster rate, Quest accepted $135.48 from Anthem (with $27.10 of the aggregate negotiated rate being paid by Pojawis, presumably as co-insurance), or about 6.07% of Quest's chargemaster rate.  In other words, Anthem would have received the equivalent of a nearly 94% discount were the chargemaster rates actually a reasonable value for the services rendered.

121.    Additionally, Quest billed Pojawis in the aggregate, without a breakdown of reimbursements from his Benefit Plan for each individual diagnostic test, although Quest was reimbursed by Anthem on an individual test-by-test basis.  For example, Pojawis's invoice

demanded he pay Quest $343.30 for its services. Pojawis's invoice included eleven line items with an aggregate chargemaster rate of $2,549.08. Quest applied an aggregate "Insurance Discount" of $2,097.40 (without breaking the amount down on test-by-test basis) to the aggregate chargemaster rate, and then reduced the bill by $108.38 for "Insurance Paid" (again, without breaking down the amount on a test-by-test basis). Given that no single line item equaled $343.30, and the fact that the "Insurance Discount" and "Insurance Paid" amounts were not broken down test-by-test, it was impossible for Pojawis to understand from the invoice what he was being charged for – whether copays, deductibles, or tests that were not covered by his Benefit Plan. *See* Exhibit A. As such, Quest's materially deficient disclosures on its invoice concealed the fact that it was charging Pojawis an excessive rate well above the fair market value of its services.

**Stephen Timm (California)**

122.    At all relevant times hereto, Plaintiff Stephen Timm maintained health insurance through Anthem.

123.    On April 28, 2016, Timm had blood drawn at a Quest facility. Quest subsequently performed laboratory services.

124.    Quest and Timm had not reached any agreement in advance with respect to the fees to be charged for any tests not covered by Anthem. Rather, Timm reasonably assumed that, at worst, Quest would charge fair market value rates for any uncovered services.

125.    Quest billed Timm its chargemaster rate of $168.24 for a single laboratory test not covered by Anthem—a "Qualitative or Semiquantitative Immunoassays" test (CPT code 86001)—rather than the fair market value of its services.

126.    Had Anthem covered the CPT code 86001 test, Quest would have been

compensated substantially less than its chargemaster rate. For example, according to the 2017 CLFS, Quest would have been compensated only $7.16, or about 4.26% of its chargemaster rate, had Medicare covered the same test.

127.    Anthem did cover eight laboratory services performed by Quest on April 28, 2016, which had an aggregate chargemaster rate of $845.54. Quest accepted $108.96 for those tests, or about 12.89% of Quest's aggregate chargemaster rate.

128.    Indeed, the windfall Quest seeks by charging its chargemaster rate (when compared to the Medicare reimbursement rate) would likely be even greater using Anthem's negotiated rate (although unknown at this time) given the fact that Anthem paid *less* than the maximum Medicare reimbursement rates on the eight laboratory services it did cover:

| CPT Code | Quest's Chargemaster Rate | | 2017 CLFS Maximum Payment Amount | | Insurance Rate | |
|---|---|---|---|---|---|---|
| 86038 | $ | 84.36 | $ | 16.58 | $ | 10.79 |
| 82164 | $ | 140.61 | $ | 20.03 | $ | 13.03 |
| 85652 | $ | 37.12 | $ | 3.70 | $ | 2.41 |
| 36415 | $ | 22.50 | $ | 3.00 | $ | 2.10 |
| 86431 | $ | 58.49 | $ | 7.78 | $ | 5.07 |
| 86140 | $ | 75.37 | $ | 7.10 | $ | 4.62 |
| 86609 | $ | 346.20 | $ | 88.35 | $ | 57.50 |
| 86606 | $ | 80.89 | $ | 20.65 | $ | 13.44 |
| **TOTALS** | **$** | **845.54** | **$** | **167.19** | **$** | **108.96** |

129.    Timm, under protest, paid the full amount Quest claimed was due in order to avoid further collection attempts and damage to his credit rating.

130.    Additionally, Quest billed Timm in the aggregate, without a breakdown of reimbursements from his Benefit Plan for each individual diagnostic test, although Quest was reimbursed by Anthem on an individual test-by-test basis. For example, Timm's invoice demanded he pay Quest $190.03 for its services. Timm's invoice included nine line items with

an aggregate chargemaster rate of $1,013.78.  Quest applied an aggregate "Insurance Discount" of $736.58 (without breaking the amount down on test-by-test basis) to the aggregate chargemaster rate, and then reduced the bill by $87.17 for "Insurance Paid" (again, without breaking down the amount on a test-by-test basis).  Given that no single line item equaled $190.03, and the fact that the "Insurance Discount" and "Insurance Paid" amounts were not broken down test-by-test, it was impossible for Timm to understand from the invoice what he was being charged for – whether copays, deductibles, or tests that were not covered by his Benefit Plan.  *See* Exhibit B.  As such, Quest's materially deficient disclosures on its invoice concealed the fact that it was charging Timm an excessive rate well above the fair market value of its services.

### Liang Yu **(Massachusetts)**

131.    At all relevant times, Plaintiff Liang Yu maintained health insurance through BCBS of MA.

132.    On March 28, 2017, Yu had blood drawn at her doctor's office for purposes of laboratory testing.  The laboratory services were subsequently performed by Quest.

133.    On April 3, 2017, Yu had blood drawn at a Quest facility.  Quest subsequently performed laboratory services.

134.    Quest and Yu had not reached any agreement in advance with respect to the fees to be charged for any tests not covered by BCBS of MA.  Rather, Yu reasonably assumed that, at worst, Quest would charge fair market value rates for any uncovered services.

135.    Quest billed Yu aggregate chargemaster rates, rather than fair market values, of $141.73 for two laboratory services performed on March 28, 2017, and $357.71 for two laboratory services performed on April 3, 2017.

136.    The March 28, 2017 invoice included two individual line items:  "Bacteria, Amp

Probe" test (CPT code 87591), with a chargemaster rate of $103.49, and a "RPR (DX) W/REFL

TITE" test (CPT code 86592), with a chargemaster rate of $38.24.

137.    The April 3, 2017 invoice included two individual line items:  Venipuncture

(CPT code 36415), with a chargemaster rate of $21.37, and "TB Cell Med Gamma Inter" (CPT

code 86480), with a chargemaster rate of $336.34.

138.    The aggregate total of both invoices is $499.44.

139.    Had BCBS of MA covered the four laboratory services, Quest would have

received substantially less than the $499.44 it demanded from Yu.  For example, based on the

2017 CLFS, had Medicare covered the laboratory services, Quest would have received only

$54.00 for the March 28th invoice, or 38.10% of Quest's aggregate chargemaster rate, and

$88.02 for the April 3rd invoice, or 24.61% of Quest's aggregate chargemaster rate.  The

egregious disparity between Quest's chargemaster rates and the maximum 2017 CLFS rates are

demonstrated in the following chart:

| CPT Code | Quest's Chargemaster Rate | 2017 CLFS Maximum Payment Amount |
|---|---|---|
| 87591 | $      103.49 | $      48.14 |
| 86592 | $      38.24 | $      5.86 |
| 36415 | $      21.37 | $      3.00 |
| 86480 | $      336.34 | $      85.02 |
| **TOTALS** | **$      499.44** | **$      142.02** |

140.    Under protest, Yu paid Quest the full $499.44.

**Other Complaints**

141.    Many consumers have voiced complaints in public forums about Quest similar to

Plaintiffs' allegations:[3]

    a.   G. of NV on April 15, 2014:

I had gone to my Primary Care doctor for a yearly type checkup. He ordered a number of blood tests to check and see if my medications were working properly. I was sent to their in-house lab, Quest Diagnostics. Prior to doing the tests, they demanded' that I sign a form stating that if the insurance company would not pay that I would be responsible. I thought that I had never had any difficulty with Medicare paying for blood tests, so I signed.  Well, I think they have a reason for having you sign this document up front. When bills are sent to Medicare, they adjust the amount downward typically so the patient isn't overcharged. Hmm.

Quest submitted the bill to Medicare using codes that did not match what the doctor had ordered and 95% of the items for routine blood tests were denied. Hmm. Quest rebilled me for over a thousand dollars at their full price amount. My question is do they do this on purpose. After emails and certified letters to Quest requesting their help in resolving the denial by Medicare, I received no correspondence, emails, phone call, etc. Just a new bill from a collection agency. Hmm. After reading a number of other posts regarding Quest that too seems to be their typical MO.

I guess I have no recourse except to take them to court. If anyone knows someone to file a complaint with, please let me know. I recently went back to the same doctor and he needs additional blood work. I refused to go to Quest and requested an alternative. The doctor also was not that helpful in helping resolve the issue either. Hmm. Another possible question could be asked here. Does the doctor receive referral money back from Quest? I'm irritated as hell and don't need this aggravation.

    b.   P. of FL on Aug. 8, 2014:

When checking in for blood work, a Quest Diagnostics Rep will take your driver's license and insurance card. The customer will assume by this action, that they are validating your request. Not the case. We received a bill for nearly $4,000 in blood work (which in of itself is insane) as our United Health Care Insurance does not cover Quest (they do not cover them as they charge twice as much for the same test as other labs).  If the Quest Rep had told us that they did not take our insurance, my husband would have gone to LabCorp which takes United Health Care to have his blood drawn. After looking at all the others that this has happened to, it appears to

---

[3] Available at, https://www.consumeraffairs.com/health/quest_diagnostics.html (last viewed August 17, 2017).

be something Quest does intentionally and requires a class action suit!

    c.  R. of FL on Dec. 9, 2014:

Opened a letter today stating it was a 3rd notice and is seriously late from Quest Diagnostics. It is a bill for the amount of $1,462.08 for lab work that was denied by my insurance, and not authorized by me either. I still don't even know what the charges are actually for and have not seen any bill previous to this or had any contact with Quest regarding this. The bill is dated for July 14, 2014 by a doctor who is not even practicing anymore.

After contacting Blue Cross/Blue Shield they suggest I submit an appeal along with all documentation stating the lab work was medically necessary, I was also told that the lab work would have needed their prior approval to be covered in the first place, basically, the lab work was not authorized by the insurance company or myself. This seems like some kind of fraudulent scam of billing for service not rendered and hoping the patient will pay just due to the confusing terms on the statements, in any account, due to the amount it will need to be handled by a lawyer, possibly looking into a class action suit due to other patients I have heard complaining of the same issue with Quest Diagnostics and the invisible doctor.

Updated on 12/26/2014:

AN UPDATE TO: R. of FL on Dec. 9, 2014 post - After repeatedly trying to contact Quest Diagnostics billing department by phone and email I received the following response: "Dear **, Unfortunately we are not able to discuss the testing ordered for you. Please contact a doctor's office with any further questions about the tests performed." I already told them that the doctor closed/sold his practice during the one month period that I gave a urine sample and my follow-up so I could get my prescriptions filled. He's gone, I never even got the results, had to submit to another lab test to Logan Labs. HOW AM I SUPPOSE TO DISCUSS THE TESTING THEY SUPPOSEDLY PERFORMED WITH A DOCTOR WHO HAS PACKED UP AND LEFT TOWN - QUEST DIAGNOSTICS LABS ARE CROOKS!!!!

    d.  B. of NY on Jan. 9, 2015:

Went to get blood work for daughter as though she may have genetic abnormality. Referred by our geneticist. Aetna denied the bill ($3,000). Said it was experimental. I tried call[ing] Quest to work out a lower fee. I can't afford $3,000. The Aetna rate would have been only $375. Neither doctor nor Quest sought prior approval from Aetna. I can't believe I'm the first person to have Aetna and this insurance and they knew it was going to happen. No one seems to have authority to help me. Now it is in collections.

    e.  K. of SC on April 3, 2015:

I had my labs drawn at Any lab Test Now for the advertised price of $99 for the set of thyroid labs I needed to have drawn. They asked if I had a doctor's order and

insurance so I gave my information believing the price would be the same. When I got the bill from Quest, for the exact same labs, the price was $483.00 not covered by insurance. I repeatedly requested that they adjust the price to the advertised price and pointed out that their price exceeds other labs by hundreds of dollars. Not only were they unwilling to adjust my bill, but responded in a rote, unconcerned and inappropriate manner. ** responded several times telling me to take it up with my insurance company, even though my insurer had nothing to do with the billing discrepancy. Reasonable requests are categorically dismissed. What recourse is there for the consumer? I intend to find out.

   f. D. of GA on April 8, 2015:

I had genetic testing done during my pregnancy, ordered by my doctor. The doctor ordered 19 tests. The phlebotomists at Quest Diagnostics were clueless as to what codes to put in the system since they were not familiar with the tests and put in some extra tests. This resulted in Quest ordering the wrong test, particularly test code 81223, Cystic Fibrosis Full Sequence, which was NOT ordered by my OBGYN and my insurance company AETNA denies and for which Quest charges me $3,380.

After numerous calls to Quest to review their order when compared to my doctor's order and fix the bill, no one knows what to do and one rep even told me that this can't be done and I should just pay. Every reputable company has a way for the consumer to appeal charges if he/she believes they're wrong or a result of a mistake. Quest conveniently doesn't have that process in place and forces people to just pay for their mistakes. Now I have engaged my doctor in trying to reach Quest as well and appeal the charge because it was NOT what he ordered. But even he admitted that it would be hard to get to the person at Quest who makes the decisions.  So unfair and has caused my family so much worry in a time when we're supposed to be happy expecting our child.

   g. M. of VA on Oct. 22, 2015:

*Satisfaction Rating*

I don't normally vent online, but I cannot comprehend how 3 lab tests that my Doctor ordered, billed to a code, my insurance company would not accept, will cost us over $1,000 from Quest Diagnostics. But had they been billed to a code accepted by our insurance company would have only cost the insurance company $166 (covered 100%). I cannot wrap my head around the discrepancy. Even the employees cannot provide a reasonable explanation.

   h. J. of GA on Oct. 29, 2015:

I received a totally unexpected bill for $218.48 from Quest in mid-August for a homocysteine test my doctor had ordered. Since I had this test at least twice before which was covered by Blue Cross HMO before I changed to Aetna, I was surprised

that Aetna Medicare Advantage did not pay for it. I called Aetna and they referred me to their website which outlines their reasons for denial of coverage of the homocysteine test. Of course I strongly disagree with their (supposedly) science-based analysis of the merit of the homocysteine test for cardiovascular risk (and assume my doctor did also, since he ordered the test), but was helpless to change their denial of coverage in my case.

I was prepared to pay the Quest Lab bill ($218.48) for the homocysteine test until I called a local lab (Any Lab Test) and found that they only charge $89.00 for the test. Then I checked lef.org and found the homocysteine test offered for $64.00. I then called Quest and spoke to a lady named Juanida, who told me she would research whether or not the bill could be adjusted and get back to me. During the conversation with Juanida I emphasized the fact that the Quest bill was at least twice to three times the amount the other labs were charging for the same test. I also was very upset that I had no bargaining power at all. I had no prior opportunity to bargain for a better price. Quest simply dictated the amount they wanted me to pay, and I had no input whatsoever about the amount. I had to pay it -- or else.

I can't think of a similar situation -- outside of healthcare billing -- where the customer is ordered to pay for an item or service without having any say at all in the price, and no ability to shop around for a better bargain. Since I didn't hear back from her over a couple of weeks, I called again on 9/21 and she said that she was hopeful, and in fact, fairly sure, the bill could be reduced, and would call me back when she got an answer. She did not call me back, so I called her at least twice more over a period of a couple of weeks, leaving messages. Still no response.

I am extremely angry. It is not just a matter of being billed too high a price for a service I never contracted for with Quest Labs either directly or indirectly. It is my realization that we patients as consumers have no bargaining power in the U.S. medical care system and are basically helpless. And indeed, this whole scenario of my dealings with Aetna and Quest seems to me symptomatic of what's wrong with healthcare in the U.S., which has degenerated into a greedy free-for-all-money-grubbing battle among insurance companies, pharmacies, laboratories, doctors, hospitals, corporate controlled medicine and big pharma for financial advantage and huge corporate profits, with patients best interests not even on the radar.

      i.   M. of IL on February 26, 2016:

I am still seething after settling a blood test bill with Quest Diagnostics. What a ripoff! I have had the exact same blood work for my physical for the past 2 years. For both years the same exact amount of $674.22 was invoiced. A year ago the claim was paid by Blue Cross and Quest was paid a total amount of $76.00 as full settlement. This year Medicare only paid $42 and didn't approve all of the blood work. As a result, Quest demanded that I personally pay $358.65 or suffer the wrath of collections. They refused to accept any less. You tell me why Quest believes it's OK to charge 5 times as much just because I'm paying them instead of the insurance company. I'm counting this expense as the cost of education. Lesson learned - I'll

never use Quest again. Beware my friends...

      j.  S. of IN  on March 14, 2016:

Even though I got my lab work drawn in an in-network lab in my own hometown, Quest continues to bill the state of the ordering physician which is NOT in network, resulting in a $5000 bill as opposed to the $75 bill it would be if it was in-network and billed as it should be. Caution with any use of Quest labs and get it in WRITING that you will be billed as an in-network draw, regardless of how sure you are that you are doing everything correctly. Ridiculous markup on lab fees versus the discounts given to insurance companies.

      k.  P. of NM on August 15, 2016:

Lab test were considered needed by my doctor, but not covered by Medicare because the incorrect code was used by Quest. Hours on the phone with my doctor's assistant who reportedly informed Quest of the proper code. No luck. They refused to change code, which if they would have been reimbursed by Medicare (a fraction of what they had charged). Out of desperation I offered to pay Quest what they would have received from Medicare. "No, they do not bargain with clients." Their charge was $194, which I decided to simply pay and get them out of my life. Tried to pay using my Visa with their online service. Wanted a zip code, but my zip code was "not valid"? Tried to call them. Estimated wait, 55 minutes!

      l.  K. of FL on January 17, 2017:

I give one star because I can't put 0.  This is the worst lab, stay away.  I just got a bill of [$]1400 for a genetic pre-natal test that my insurance doesn't cover.  I did some research and my insurance compa[ny] would [have] paid less than [$]300 dollars.  Why Quest Diagnostics can give us the same price, obviously 300 is enough.  This is very unfair and dishonest.  When I call them they treat me like an idiot.  When I ask about the differences about this price and the one they would get from any insurance company, they just said "well this is the test price."  Go somewhere else to do your test or at least be sure it is cover[ed] before so you can negotiate the price.  They are doing more than [$]1100 taking advantage of a pregnant woman.  They just have no ethic.

      m.  C. of AR on March 14, 2017

My experience with Quest Diagnostics has been horrible. They have not filed or followed through to help collect debt through my insurance carrier. It has been a battle all the way. I am just now paying final invoices from early 2016. No wonder insurance cost are so high. As one example, I was billed $1104.35 for lab work dated July 2016. I worked and worked to get this filed through the proper insurance process. They discounted the $1104.35 by $952.03 and then insurance paid $121.85, leaving me $30.47 to pay. So, if I happened to be a non-aggressive person and took things at face value, I would have paid over a $1,000 for nothing. This

overstatement of cost incurred has occurred on every statement and invoice I have received from them. No wonder people are going broke and cannot pay medical cost and insurance prices have sky-rocketed. Who takes up for the consumer/patient? This process will frustrate you to no end!

142.    The following was posted on a different website by "COD" at 6:56 PM on June 25, 2013:

We got a lab bill yesterday. $700 retail. $90 at our insurance company's contracted price. So definitely make sure you are getting the contract price.[4]

143.    A similar complaint was filed with the Better Business Bureau:

Poor customer services & inequitable billing practices. After inquiring by phone without satisfaction, we've attempted to contact Quest through their on-line feedback service -- these questions have not been responded to. We have been billed for a blood test at a rate of $1061.81, where the insured bill rate for the same test is $166. Unfortunately, though the medical specialist who requested the test insisted it was medically required, our insurance (AETNA) declined the claim, therefore leaving us to pay direct. This in and of itself would have been fine - - however, Quest is charging us as in an uninsured capacity at 6.4 times the amount. Completely unacceptable. I require a satisfactory response, and have not obtained this.  [Roland, 11/23/2015][5]

144.    Plaintiffs' counsel continues to be contacted by class members expressing interest in joining this action as a named plaintiff.  Plaintiffs reserve the right to propose subsequent amendments to add plaintiffs, including plaintiffs from different states, to the complaint.

## CLASS ACTION ALLEGATIONS

145.    Plaintiffs bring this action on behalf of themselves and on behalf of the national Class, defined above as all persons who were charged fees for services by Quest that were in

---

[4] Available at, http://ask.metafilter.com/243590/Insurance-company-denied-coverage-for-1300-blood-work-what-now (last viewed August 17, 2017).

[5] Available at, https://www.bbb.org/new-jersey/business-reviews/laboratories-medical/quest-diagnostics-in-madison-nj-90010452/reviews-and-complaints (last viewed August 17, 2017).

excess of the negotiated or mandated fair market value rates established for those services between Quest and private or public insurers.  In the event there is no fair market value rate already established for a particular Quest service by arm's-length agreement between Quest and class member's Benefit Plans or by public insurers, Plaintiffs seek a declaration as to a reasonably comparable fair market value rate.  A fair market value rate for these purposes is defined as "the price that would be agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts."  *See* IRS Publication 561.  A fair market value rate can be determined based on a reasonable percentile (such as the 51st percentile) of the amounts actually received by Quest from customers and Benefit Plans for its services.   Excluded from the Class is Quest, its parents, subsidiaries, officers, directors, employees, partners, and co-ventures.

146.    Plaintiffs also brings this action on behalf of the following Sub-Classes:

a.    All persons residing in the State of Illinois who were charged fees for services by Quest that were in excess of the negotiated or mandated fair market value rates established for those services between Quest and private or public insurers (the "Illinois Sub-Class") (Bennett);

b.    All persons residing in the State of Colorado who were charged fees for services by Quest that were in excess of the negotiated or mandated fair market value rates established for those services between Quest and private or public insurers (the "Colorado Sub-Class") (Dannelly);

c.    All persons residing in the State of California who were charged fees for services by Quest that were in excess of the negotiated or mandated fair market value

rates established for those services between Quest and private or public insurers (the "California Sub-Class") (Golikov and Timm);

d.      All persons residing in the Commonwealth of Pennsylvania who were charged fees for services by Quest that were in excess of the negotiated or mandated fair market value rates established for those services between Quest and private or public insurers (the "Pennsylvania Sub-Class") (Herrmann and Hodges);

e.      All persons residing in the State of North Carolina who were charged fees for services by Quest that were in excess of the negotiated or mandated fair market value rates established for those services between Quest and private or public insurers (the "North Carolina Sub-Class") (Martyn); and

f.      All persons residing in the Commonwealth of Massachusetts who were charged fees for services by Quest that were in excess of the negotiated or mandated fair market value rates established for those services between Quest and private or public insurers (the "Massachusetts Sub-Class") (Yu).

147.    This action is brought as a class action pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure, sub-sections 23(a) and 23(b)(2) and/or (b)(3).  The Class and Sub-Classes (collectively, the "Class") satisfy the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

148.    The members of the Class are so numerous that joinder of all Class members is impracticable.  While the exact number of Class members can be determined only by appropriate discovery, Plaintiffs believe that there are thousands of Class members residing throughout the United States.  Quest claims to have performed over 100 million laboratory tests in 2016 alone.

149.    Because of the geographic dispersion of Class members, there is judicial economy arising from the avoidance of a multiplicity of actions in trying this matter as a class action.

150.    Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs have no interests that are adverse or antagonistic to those of the Class.  Plaintiffs' interests are to obtain relief for themselves and the Class for the harm arising out of the violations of law set forth herein.

151.    In opposing the motion to dismiss in *Leslie*, Defendant acknowledged that the laws of *quantum meruit* and unjust enrichment are uniform among the different states.  Dkt. No. 11-1 at 20 n.5.

152.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in complex and consumer class action litigation.

153.    A class action is superior to all other methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by the members of the Class may be relatively small, the expense and burden of individual litigation make it virtually impossible for Plaintiffs and members of the Class to individually seek redress for the wrongful conduct alleged.

154.    In addition, as alleged herein, Quest has acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

155.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the

questions of law and fact common to the Class are:

a.  Whether Quest violated the New Jersey Consumer Fraud Act, Illinois Consumer Fraud and Deceptive Business Practices Act, Colorado Consumer Protection Act, California Consumers Legal Remedies Act, California Unfair Competition Law, Pennsylvania Unfair Trade Practices and Consumer Protection Law, North Carolina Unfair and Deceptive Trade Practices Act, and Massachusetts Consumer Protection Law;

b.  Whether Quest breached its contractual obligations to Plaintiffs and the Class;

c.  Whether the amount Quest is entitled to charge patients is equivalent to the fair market value of its services;

d.  Whether Quest billed Plaintiffs and members of the Class amounts in excess of the fair market value of its services;

e.  Whether Quest deceived Plaintiffs and members of the Class by billing for services at excessive rates, without disclosing that it had agreed with Benefit Plans to accept rates that reflect the fair market value of its services;

f.  The proper measure of damages to be paid to Plaintiffs and the Class;

g.  Whether Plaintiffs and the Class are entitled to injunctive or other equitable relief to remedy Quest's continuing violations of law as alleged herein; and

h.  Whether Quest has been unjustly enriched by its inequitable and unlawful conduct, and if so, whether Quest should be forced to disgorge inequitably obtained revenues or provide restitution.

156.  The Class is readily definable, and prosecution of this action and a class action

will reduce the possibility of repetitious litigation.

157.    Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

158.    Reliance among Class members may be assumed because no one would knowingly pay an excessive rate.

## FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

159.    Quest has engaged in fraudulent, misleading and deceptive efforts to conceal the true nature of its unlawful conduct from Plaintiffs and the Class.  Quest intended to and has in fact accomplished its concealment by its active misrepresentations and omissions, as described herein.

160.    Specifically, Quest mails invoices to patients that groups all lab work charges together, and only identifies the aggregate insurance discounts and Benefit Plan payments. Quest fails to inform patients of the specific instances where a Benefit Plan denies coverage. Patients are also not provided with the discounts negotiated by the Benefit Plans when paying on their own behalf.  *See* Exhibits A and B.

161.    Due to Quest's fraudulent concealment, many Plaintiffs have only recently learned of the existence of their claims against Quest.

162.    Plaintiffs' lack of knowledge as to their claims against Quest were not due to any fault or lack of diligence on their part, but rather due entirely or substantially to Quest's acts designed to conceal and hide the true and complete nature of its unlawful and inequitable conduct.

<u>COUNT I</u>
**Violations of the New Jersey Consumer Fraud Act,**
**N.J. Stat. Ann. §56:8-1,** *et seq.*
**(On behalf of Plaintiffs and the Class)**

163.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing

paragraphs as if fully set forth herein.

164.    Quest is a "person" as defined in the New Jersey Consumer Fraud Act

("NJCFA").  N.J.S.A. §56:8-1(d).

165.    The NJCFA states in pertinent part:

> The act, use or employment by any person of any unconscionable
> commercial practice, deception, fraud, false pretense, false
> promise, misrepresentation, or the knowing, concealment,
> suppression, or omission of any material fact with intent that others
> rely upon such concealment, suppression or omission, in
> connection with the sale or advertisement of any merchandise or
> real estate, or with the subsequent performance of such person as
> aforesaid, whether or not any person has in fact been misled,
> deceived or damaged thereby, is declared to be an unlawful
> practice…

> N.J.S.A. §56:8-2.

166.    As alleged herein and above, Quest has engaged in unconscionable commercial

practices, deception, and fraud in connection with its improper billing and debt collection for

laboratory testing and other services, including their practices of overbilling individual

consumers.  These acts and practices violate the NJCFA.

167.    Plaintiffs have been and continue to be injured as a direct and proximate result of

Quest's violations of the NJCFA.

168.    Plaintiffs and the other members of the nationwide Class either (i) paid Quest's

bill under duress, (ii) refused to pay Quest's bill because of its excessive rates, or (iii) paid

Quest's bill in reliance on a presumption that Quest had billed them the commercially

reasonable fair market value.  No person would have knowingly paid an excessive rate.

169.    Plaintiffs are entitled to pursue a claim against Quest pursuant to N.J.S.A. §§56:8-2.11, 56:8-2.12 and/or 56:8-19 for damages, treble damages, equitable relief, and attorneys' fees and costs to remedy Quest's violations of the NJCFA.

### COUNT II
**Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 Ill. Comp. Stat. § 505 *et seq*.**
**(On behalf of Plaintiff Bennett and the Illinois Sub-Class)**

170.    Plaintiff Jennifer Bennett herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

171.    Quest is a "person" as defined in the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFDBPA").  815 Ill. Comp. Stat. § 505/1(c).

172.    Under 815 Ill Comp. Stat. § 505/2, the CFDBPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices," including, *inter alia*:

> the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, … in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

173.    The CFDBPA also prohibits violations of the Uniform Deceptive Trade Practices Act (815 Ill. Comp. Stat. § 510 *et seq*.), which includes, *inter alia*, when a person "makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions," or a person "engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

174.    As alleged herein and above, Quest has engaged in unfair methods of competition and unfair or deceptive acts or practices in connection with its improper billing and debt collection for laboratory testing and other services, including their practices of overbilling

individual consumers.  These acts and practices violated the CFDBPA.

175.    Bennett and the other members of the Illinois Sub-Class have been and continue

to be injured as a direct and proximate result of Quest's violations of the CFDBPA.

176.    Bennett and the other members of the Illinois Sub-Class either (i) paid Quest's

bill under duress, (ii) refused to pay Quest's bill because of its excessive rates, or (iii) paid

Quest's bill in reliance on a presumption that Quest had billed them the commercially

reasonable fair market value.  No person would have knowingly paid an excessive rate.

177.    Bennett is entitled to pursue a claim on behalf of the class against Quest for

actual damages, punitive damages, and equitable relief to remedy Quest's violations of the

CFDBPA under 815 Ill. Comp. Stat. § 505/10a, which also entitles Bennett to costs and

attorneys' fees.

178.    Bennett is also entitled to pursue injunctive relief and attorneys' fees and costs

against Quest for violations of the Uniform Deceptive Trade Practices Act pursuant to 815 Ill.

Comp. Stat. § 510/3.

## COUNT III
### Violations of the Colorado Consumer Protection Act
### Colo. Rev. Stat. §§6-1-101 *et seq*.
### (On behalf of Plaintiff Dannelly and the Colorado Sub-Class)

179.    Plaintiff Diana Dannelly herein repeats and realleges each of the allegations set

forth in the foregoing paragraphs as if fully set forth herein.

180.    Quest is a "person" as defined in the Colorado Consumer Protection Act

("CCPA").  Colo. Rev. Stat. §6-1-102(6).

181.    Colo. Rev. Stat. §6-1-105 states in pertinent part:

> (1)  A person engages in a deceptive trade practice when, in the
> course of the person's business, vocation, or occupation, the person:

*        *        *

(l)  Makes false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reductions;

\*        \*        \*

(u)  Fails to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction

\*        \*        \*

(3)  The deceptive trade practices listed in this section are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state.

182.    As alleged herein and above, Quest has engaged in a deceptive trade practice in connection with its improper billing and debt collection for laboratory testing and other services, including their practices of overbilling individual consumers.  These acts and practices violated the CCPA.

183.    Dannelly and the other members of the Colorado Sub-Class have been and continue to be injured as a direct and proximate result of Quest's violations of the CCPA.

184.    Dannelly and the other members of the Colorado Sub-Class either (i) paid Quest's bill under duress, (ii) refused to pay Quest's bill because of its excessive rates, or (iii) paid Quest's bill in reliance on a presumption that Quest had billed them the commercially reasonable fair market value.  No person would have knowingly paid an excessive rate.

185.    Dannelly is entitled to pursue a claim on behalf of the class against Quest under Colo. Rev. Stat. §6-1-113 for equitable relief to remedy Quest's violations of the CCPA.

<u>**COUNT IV**</u>
**Violations of the California Consumers Legal Remedies Act,**
**Cal. Civ. Code §§ 1750, *et seq*.**
**(On behalf of Plaintiffs Golikov and Timm and the California Sub-Class)**

186.    Plaintiffs Edie Golikov and Stephen Timm herein repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

187.    Quest is a "person" as defined in Cal. Civ. Code § 1761(c).

188.    Quest's laboratory testing services constitute "services" under Cal. Civ. Code § 1761(b).

189.    The California Consumers Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in … services to any consumer," which occurs when, among other instances, a person is "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions" or "[i]nserting an unconscionable provision in the contract." Cal. Civ. Code § 1770(a).

190.    As alleged herein, Quest has engaged in unfair or deceptive acts or practices in connection with its improper billing and debt collection for laboratory testing and other services, including their practices of overbilling individual consumers. These acts and practices violate the CLRA.

191.    Golikov and Timm and the other members of the California Sub-Class have been and continue to be injured as a direct and proximate result of Quest's violations of the CLRA.

192.    Golikov and Timm and the other members of the California Sub-Class either (i) paid Quest's bill under duress, (ii) refused to pay Quest's bill because of its excessive rates, or (iii) paid Quest's bill in reliance on a presumption that Quest had billed them the commercially reasonable fair market value rate. No person would have knowingly paid an excessive rate.

193.    Golikov and Timm are entitled to pursue a claim against Quest on behalf of the California Sub-Class for damages, to enjoin Quest from continuing its unfair or deceptive acts or practices under Cal. Civ. Code § 1781 and § 1780, as well as to pursue costs and attorneys' fees for bringing this action to remedy Quest's violations of the CLRA pursuant to § 1780(e).

**COUNT V**
**Violations of the California Unfair Competition Law,**
**Cal. Bus. & Prof. Code §§ 17200,** *et seq.*
**(On behalf of Plaintiffs Golikov and Timm and the California Sub-Class)**

194.    Plaintiffs Edie Golikov and Stephen Timm herein repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

195.    Quest is a "person" as defined in Cal. Bus. & Prof. Code § 17201.

196.    Under the California Unfair Competition Law ("UCL"), "unfair competition" is defined broadly to mean and include "any unlawful, unfair or fraudulent business act or practice…." Cal. Bus. & Prof. Code § 17200.

197.    As alleged herein, Quest has engaged in unlawful, unfair or fraudulent business acts or practices in connection with its improper billing and debt collection for laboratory testing and other services, including their practices of overbilling individual consumers. These acts and practices violate the UCL.

198.    Golikov and Timm and the other members of the California Sub-Class have been and continue to be injured as a direct and proximate result of Quest's violations of the UCL.

199.    Golikov and Timm and the other members of the California Sub-Class either (i) paid Quest's bill under duress, (ii) refused to pay Quest's bill because of its excessive rates, or (iii) paid Quest's bill in reliance on a presumption that Quest had billed them the commercially reasonable fair market value rate. No person would have knowingly paid an excessive rate.

200.    Golikov and Timm are entitled to pursue a claim against Quest on behalf of the

California Sub-Class pursuant to Cal. Bus. Prof. Code §§ 17203, 17204, 17205, and/or 17206 for

damages, restitution, and equitable relief to remedy Quest's violations of the UCL, and to move

under Cal. Code Civ. Proc. § 1021.5 for costs and attorneys' fees for any significant benefit

conferred upon the general public or a large class of persons in relation to enjoining Quest from

continuing to violate the UCL.

**COUNT VI**
**Violations of the Pennsylvania Unfair Trade Practices**
**and Consumer Protection Law,**
**Pa. Stat. Ann. Tit. 73, §§201-1, *et seq.***
**(On behalf of Plaintiffs Herrmann and Hodges and the Pennsylvania Sub-Class)**

201.    Plaintiff Dolores Herrmann and Lonnie Hodges Jr. herein repeats and realleges

each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

202.    Quest is a "person" as defined in the Pennsylvania Unfair Trade Practices and

Consumer Protection Law ("UTPCPL").  Pa. Stat. Ann. §201-2(2).

203.    Quest's lab services constitute "trade" or "commerce" as defined in Pa. Stat.

Ann. §201-2(3).

204.    The UTPCPL declares unlawful any "[u]nfair methods of competition and unfair

or deceptive acts or practices in the conduct of any trade or commerce," which includes, among

others, "[m]aking false or misleading statements of fact concerning the reasons for, existence of,

or amounts of price reductions" and "[e]ngaging in any other fraudulent or deceptive conduct

which creates a likelihood of confusion or of misunderstanding."  Pa. Stat. Ann. §§201-3, 201-

2(4)(xi) and (xxi).

205.    As alleged herein and above, Quest has engaged in unfair methods of

competition and unfair or deceptive acts or practices in connection with its improper billing and

debt collection for laboratory testing and other services, including their practices of overbilling

individual consumers.  These acts and practices violate the UTPCPL.

206.    Herrmann and Hodges and the other members of the Pennsylvania Sub-Class have been and continue to be injured as a direct and proximate result of Quest's violations of the UTPCPL.

207.    Herrmann and Hodges and the other members of the Pennsylvania Sub-Class either (i) paid Quest's bill under duress, (ii) refused to pay Quest's bill because of its excessive rates, or (iii) paid Quest's bill in reliance on a presumption that Quest had billed them the commercially reasonable fair market value.  No person would have knowingly paid an excessive rate.

208.    Herrmann and Hodges are entitled to pursue a claim on behalf of the Pennsylvania Sub-Class against Quest pursuant to Pa. Stat. Ann. §201-9.2 for damages, treble damages, equitable relief, and attorneys' fees and costs to remedy Quest's violations of the UTPCPL.

<u>COUNT VII</u>
**Violations of the North Carolina Unfair and Deceptive Trade Practices Act**
**N.C. Gen. Stat. §§ 75-1, et seq.**
**(On behalf of Plaintiff Martyn and the North Carolina Sub-Class)**

209.    Plaintiff Lily Martyn herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

210.    Quest's laboratory testing services are "in or affecting commerce" under N.C. Gen. Stat. § 75-1.1(a).

211.    The North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") declares unlawful any "unfair or deceptive acts or practices in or affecting commerce."  N.C. Gen. Stat. § 75-1.1(a).

212.    As alleged herein, Quest has engaged in unfair or deceptive acts or practices in connection with its improper billing and debt collection for laboratory testing and other services,

including their practices of overbilling individual consumers.  These acts and practices violate the UDTPA.

213.    Each invoice sent by Quest that overbills Plaintiffs and each member of the Class and North Carolina Sub-Class establishes a separate offense of the UDTPA pursuant to N.C. Gen. Stat. § 75-8.

214.    Martyn and the other members of the North Carolina Sub-Class have been and continue to be injured as a direct and proximate result of Quest's violations of the UDTPA.

215.    Martyn and the other members of the North Carolina Sub-Class either (i) paid Quest's bill under duress, (ii) refused to pay Quest's bill because of its excessive rates, or (iii) paid Quest's bill in reliance on a presumption that Quest had billed them the commercially reasonable fair market value rate.  No person would have knowingly paid an excessive rate.

216.    Martyn is entitled to pursue a claim on behalf of the North Carolina Sub-Class against Quest seeking actual damages and treble damages pursuant to N.C. Gen. Stat. § 75-16, which provides:

> [i]f any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict.

217.    Martyn and the other members of the North Carolina Sub-Class are also entitled to seek attorneys' fees for bringing this action to remedy Quest's violations of the UDTPA, under N.C. Gen. Stat. § 75-16.1.

**COUNT VIII**
**Violations of the Massachusetts Consumer Protection Law,**
**Mass. Gen. Law ch. 93A, §§ 1 *et seq.***
**(On behalf of Plaintiff Yu and the Massachusetts Sub-Class)**

218.    Plaintiff Yu herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

219.    Quest is a "person" as defined in Mass. Gen. Laws ch. 93A, § 1(a).

220.    Quest's laboratory testing services constitutes "trade" and "commerce" under Mass. Gen. Laws ch. 93A, § 1(b).

221.    The Massachusetts Consumer Protection Law ("MCPL") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. Laws ch. 93A, § 2(a).

222.    As alleged herein, Quest has engaged in unfair or deceptive acts or practices in connection with its improper billing and debt collection for laboratory testing and other services, including their practices of overbilling individual consumers.  These acts and practices violate the MCPL.

223.    Plaintiff Yu and the other members of the Massachusetts Sub-Class have been and continue to be injured as a direct and proximate result of Quest's violations of the MCPL.

224.    Plaintiff Yu and the other members of the Massachusetts Sub-Class either (i) paid Quest's bill under duress, (ii) refused to pay Quest's bill because of its excessive rates, or (iii) paid Quest's bill in reliance on a presumption that Quest had billed them the commercially reasonable fair market value rate.  No person would have knowingly paid an excessive rate.

225.    Plaintiff Yu is entitled to pursue a claim against Quest on behalf of the Massachusetts Sub-Class for damages and to enjoin Quest from continuing its unfair or deceptive acts or practices Mass. Gen. Laws ch. 93A, § 9, as well as to pursue costs and attorneys' fees for

bringing this action to remedy Quest's violations of the MCPL pursuant to § 11.

**COUNT IX**
**Breach of Contract**
**(On behalf of Plaintiffs and the Class)**

226.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

227.     Quest provided services to Plaintiffs and other members of the nationwide Class pursuant to an implied contract that Quest would bill Plaintiffs (if their claims were disallowed by insurance) for the reasonable fair market value of Quest's services (*quantum meruit*).

228.     Quest violated the terms of that implied contract by billing Plaintiffs and other members of the nationwide Class at excessive rates that were not based on negotiated fair market rates agreed to between Quest and Benefit Plans, or otherwise applicable to Plaintiffs and the nationwide Class.

229.     The covenant of good faith and fair dealing is an implied term in all contracts.

230.     Quest, in violation of the covenant of good faith and fair dealing, charged Plaintiffs and members of the nationwide Class excessive chargemaster rates and failed to inform them of the negotiated fair market value rates agreed to between Quest and Benefit Plans.

231.     By virtue of Quest's wrongful conduct, Plaintiff and the members of the nationwide Class sustained money damages.

**COUNT X**
**Common Law Unjust Enrichment**
**(On behalf of Plaintiffs and the Class)**

232.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

233.    As alleged herein, Quest has unjustly benefitted from its unlawful and inequitable acts resulting in monetary payments by individuals and similarly situated nationwide Class members.

234.    Quest has and is continuing to derive profits and revenues resulting from its false, misleading, deceptive, unfair, inequitable and unconscionable conduct.

235.    It would be inequitable for Quest to be permitted to retain any of the proceeds derived as a result of its unlawful conduct.

236.    Quest should be compelled to provide restitution and to disgorge all proceeds received by Quest from Plaintiffs and/or the nationwide Class as a result any unlawful or inequitable act described in this Complaint, which has inured and continues to inure to the unjust enrichment of Quest, into a common fund or constructive trust for the benefit of Plaintiffs and the nationwide Class.

237.    Quest should also be enjoined from continuing to engage in any unlawful or inequitable methods, acts and/or practices alleged in this Complaint.

238.    Plaintiffs and the nationwide Class have no adequate remedy at law for their irreparable injuries caused by Quest's inequitable conduct.

### COUNT XI
### Common Law Fraud
### (On behalf of Plaintiffs and the Class)

239.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

240.    As alleged herein, Quest intentionally, knowingly, willfully and recklessly charged and collected fees for laboratory tests and other services in excess of fair market value rates.

241.     On its invoices, Quest does not identify claims that are rejected by Benefit Plans, the amount Benefit Plans pay for individual lab tests, what portion of the charged amounts patients are paying for individual lab tests (whether some or all), and what amount the Benefit Plan would pay for lab tests had it not rejected the claim.

242.     Quest misused its position of superior knowledge and financial strength to defraud and induce consumers into paying fees and costs Quest knew were not owed.

243.     Plaintiffs and the other members of the nationwide Class paid these fees in reliance upon the various statements, representations, and omissions of material fact made by Quest.  Those statements, representations, and omissions were made for the purpose of inducing reliance thereon by Plaintiffs and the nationwide Class to pay fees not due to Quest.

244.     Plaintiffs and the other members of the nationwide Class had a right to rely on, and did reasonably rely on, Quest's statements, misrepresentations, and omissions.  Each of Quest's misrepresentations and omissions were material, in that Plaintiffs and the nationwide Class would not have paid the improper chargemaster rates if they had known that the statements and representations of Quest were false, misleading, incomplete, unfair and untrue.

245.     Each of the misrepresentations, misleading statements, and omissions made by Quest were false, misleading, incomplete, and untrue, and were known or should have been known by Quest to be false, misleading, incomplete, and untrue when made.

246.     Each misrepresentation, misleading statement, and omission was made with intent to deceive and defraud, or to conceal the truth about Quest's deceptive billing practices, or with disregard for its truth or completeness, or in spite of the fact that it was untrue.  Each misrepresentation, misleading statement, and omission was made to induce Plaintiffs and the nationwide Class to pay fees and charges not due to Quest.

247.    Plaintiffs and the other members of the Class had no knowledge of the falsity, incompleteness, or untruth of Quest's statements and representations when they paid these fees and charges to Quest.

248.    By reason of Quest's misrepresentations, misleading statements, and omissions, Plaintiffs and the other members of the nationwide Class suffered financial injuries.

249.    The conduct of Quest in perpetrating the fraud described above was malicious, willful, wanton, and oppressive, or in reckless disregard of the rights of Plaintiffs and the other members of the nationwide Class, thereby warranting the imposition of punitive damages against Quest.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Quest, jointly, and severally, as follows:

A.    Certifying the nationwide Class and the state Sub-Classes pursuant to Rule 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiffs as representatives of the Class, and designating their counsel as counsel for the Class;

B.    Awarding Plaintiffs and the Class damages for their claims;

C.    Awarding Plaintiffs and the Class statutory and exemplary damages where permitted;

D.    Awarding Plaintiffs punitive damages;

E.    Permanently enjoining Quest from continuing to engage in the unlawful and inequitable conduct alleged herein;

F.    Declaring that Quest has engaged in the unlawful and inequitable conduct

alleged herein;

G.    Ordering Quest to disgorge into a common fund or a constructive trust all monies paid by Plaintiffs and the Class to the full extent to which Quest or any one of them were unjustly enriched by their unlawful and inequitable conduct alleged herein;

H.    Granting Plaintiffs and the Class the costs of prosecuting this action and reasonable attorneys' fees; and

I.    Grading such other relief as this court may deem just and proper under the circumstances.

## **JURY DEMAND**

Plaintiffs and the Class demand a trial by jury on all issues so triable.

Dated:  August 29, 2017

COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP

By: *s/Jeffrey W. Herrmann*
Jeffrey W. Herrmann
Audra DePaolo
Park 80 West - Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
(201) 845-9600
jwh@njlawfirm.com
ad@njlawfirm.com

*Liaison Counsel for Plaintiffs*

OF COUNSEL:

WOLF POPPER LLP
Robert C. Finkel
Joshua W. Ruthizer
Sean M. Zaroogian
845 Third Avenue, 12th Floor

New York, New York 10022
(212) 759-4600
rfinkel@wolfpopper.com
jruthizer@wolfpopper.com
szaroogian@wolfpopper.com

*Counsel for Plaintiffs*

# Exhibit A

Page 1 of 2

## Quest Diagnostics

P.O. Box 7306
Hollister, MO 65673-7306

AT 01 031408 25652B 93 A**3DGT

ԱթյուփովիցԱԱԱբոգուրգիվուվովիիՄԱբուիՄիՄիիիՄ

WCT 22223300 0010828  8559488673 R
TERESA POJAWIS

### Laboratory Invoice
For services not included in your physician's bill

| Invoice Date: | Amount Due: | Due Date: |
|---|---|---|
| **Aug. 27, 2013** | **$343.30** | **Sep. 17, 2013** |

| Invoice Number | Lab Code |
|---|---|
| **8559488673** | **WCT** |

Patient Name:        ANNA POJAWIS
Responsible Party:  TERESA POJAWIS
Date of Service:     April 09, 2013

**Lab Results and Diagnosis Questions Must Be Answered By Your Physician.**



**Customer Service**
Go to **www.QuestDiagnostics.com/bill** to conveniently pay your invoice, provide updated insurance information, or take a patient survey. **LIVE CHAT NOW AVAILABLE!**



**Phone** 1-800-933-2009
**Fax** 1-800-795-6260
WEEKDAYS 08:30 AM - 05:00 PM EST

### Laboratory Tests Were Requested By:

Referring Physician:   OTH001AIETA,FRANK L
Physician Address:     301 N MAIN ST
                       WEST HARTFORD, CT 06117

### Most Recent Insurance Claim Filed To:

Insurance Name:   BS OF CT
Insurance ID:     NEH121028
Group Number:

*Please have your invoice available for reference.*

These charges are for tests ordered by the referring physician listed and are separate from the physician's fees. Your insurance carrier denied payment, indicating the services provided are not covered under your policy. Please contact your insurance carrier with any questions regarding the processing of your claim. The amount due is your financial responsibility. Thank you for using our laboratory.

| Date | CPT Code * | Test Description | Charge | Insurance Discount | Insurance Paid | Medicare/ Medicaid Paid | Patient Paid | Patient Owes |
|---|---|---|---|---|---|---|---|---|
| 04/09/13 | 83519 | ACETYLCHOLINE RECEPT | $232.96 | | | | | |
| 04/09/13 | 86255 | STRIATED MUSCLE AB S | $145.60 | | | | | |
| 04/09/13 | 82139 | AMINO ACIDS;6->6,QNT EA S | $746.72 | | | | | |
| 04/09/13 | 36415 | VENIPUNCTURE | $19.76 | | | | | |
| 04/09/13 | 86235 | SCL-70 ANTIBODY | $78.00 | | | | | |
| 04/09/13 | 86359 | T CELLS, TOTAL COUNT | $183.39 | | | | | |
| 04/09/13 | 86360 | TCELLS;ABS CD4&8,INC RATI | $228.45 | | | | | |
| 04/09/13 | 86038 | CENTROMERE B ANTIBOD | $78.00 | | | | | |
| 04/09/13 | 81291 | MTHFR CMN VARIANTS | $316.20 | | | | | |
| | | *Continued on Next Page* | | | | | | |

Tax ID: 06-1460613   ICD-9 Codes: 710.1 780.79 719.40 716.90
Services Performed by: QUEST DIAGNOSTICS/NICHOLS SJC SAN JUAN C SAN JUAN CAPISTRANO, CA
Services Performed by: QUEST DIAGNOSTICS AVON AVON, CT
Services Performed by: QUEST DIAGNOSTICS, LLC WALLINGFORD CL 00 WALLINGFORD, CT
* The CPT codes provided are based on AMA guidelines and without regard to specific payor requirements

▲ Please fold and tear along perforation and remit with payment in the envelope provided. ▲



## Quest Diagnostics

**LIVE CHAT NOW AVAILABLE!**
Pay your bill securely at
www.QuestDiagnostics.com/bill
or call 1-800-933-2009.
Quest Diagnostics also accepts:

   

**Please make checks payable to Quest Diagnostics.**
Be sure to include invoice number on your check.

☐ Check here if address has changed.
   Please provide your new address information on the back.
   *Quest Diagnostics reserves the right to assign this receivable to any of its affiliates.*

Lab Code: WCT

| **Amount Due:** | **$343.30** |
|---|---|

Due Date: Sep. 17, 2013    **Invoice Number: 8559488673**

Patient Name: ANNA POJAWIS

| **Amount Enclosed:** | **$** |
|---|---|

*If you received an explanation of benefits showing your responsibility is less than the amount shown on this bill, please pay the lesser amount. To fully resolve your invoice, please provide a copy of your explanation of benefits.*

**MAIL PAYMENTS ONLY TO:**

QUEST DIAGNOSTICS
P.O. BOX 71310
PHILADELPHIA, PA 19176-1310

ԱԱՄԱբսբվԱ-ԱՄԱբբբԱբսԱբ-ԱբւԱԱԱ-ԱբւբբԱԱԱ

01WCT6301855948867300003433000082710602126440530000008

Quest
**Diagnostics** P.O. Box 7306
• Hollister, MO 65673-7306
**Do not use address below.**

**Laboratory Invoice**
For services not included in your physician's bill

| Invoice Date: | Amount Due: | Due Date: |
|---|---|---|
| **Aug. 27, 2013** | **$343.30** | **Sep. 17, 2013** |

**Invoice Number**    **Lab Code**
**8559488673**    **WCT**

| Lab Results and Diagnosis Questions Must Be Answered By Your Physician. |
|---|

Patient Name:    ANNA POJAWIS
Responsible Party:    TERESA POJAWIS
Date of Service:    April 09, 2013

| Date | CPT Code * | Test Description | Charge | Insurance Discount | Insurance Paid | Medicare/ Medicaid Paid | Patient Paid | Patient Owes |
|---|---|---|---|---|---|---|---|---|
| 04/09/13 | 83519 | ACETYLCHOLINE RECEPT | $287.04 | | | | | |
| 04/09/13 | 83519 | ACETYLCHOLINE RECEPT | $232.96 | | | | | |
| 05/16/13 | | PAID BY INSURANCE | | | ($108.38) | | | |
| 05/17/13 | | ADJUSTMENT | | ($2,097.40) | | | | |
| **Tax ID: 06-1460613** | | **ICD-9 Codes: 710.1 780.79 719.40 716.90** | **$2,549.08** | **($2,097.40)** | **($108.38)** | **$0.00** | **$0.00** | **$343.30** |

Services Performed by: QUEST DIAGNOSTICS/NICHOLS SJC SAN JUAN C SAN JUAN CAPISTRANO, CA
Services Performed by: QUEST DIAGNOSTICS AVON AVON, CT
Services Performed by: QUEST DIAGNOSTICS, LLC WALLINGFORD CL 00 WALLINGFORD, CT
* The CPT codes provided are based on AMA guidelines and without regard to specific payor requirements

031408 2/2

# Exhibit B

Quest
Diagnostics

Do not use address below:

**Laboratory Invoice**
For services not included in your physician's bill

| Invoice Date: | Amount Due: | Due Date: |
|---|---|---|
| May. 31, 2017 | $190.03 | Jun. 21, 2017 |

AB 01 004197 50771 B 11 A

|ıl|ıı|ılı|ıllıı|ılıı|ıl|ıllıı|ılı|ıpı|ıllı|ıılı|ıl

WHC 92660003 0000758    4985677775 R

| Invoice Number | Lab Code |
|---|---|
| **4985677775** | **WHC** |

Patient Name:
Responsible Party:
Date of Service:    April 28, 2017

> **Lab Results and Diagnosis Questions Must Be
> Answered By Your Physician.**



**Customer Service**
LOG ON NOW at www.QuestDiagnostics.com/bill to conveniently
pay your invoice, provide updated insurance information, or take a
patient survey.

### Laboratory Tests Were Requested By:

Referring Physician:
Physician Address:

**Phone: 1-800-758-6047**
MON-TH 8:30AM-5PM;FRI 09:00 AM - 04:00 PM PST
Se Habla Espanol!

### Most Recent Insurance Claim Filed To:

| | |
|---|---|
| Insurance Name: | BLUE CROSS OOS |
| Insurance ID: | IEDAN3894578 |
| Group Number: | 003330081 |

*Please have your invoice available for reference.*

These charges are for tests ordered by the referring physician listed and are separate from the physician's fees. Your insurance carrier denied payment, indicating the services provided are not covered under your policy. Please contact your insurance carrier with any questions regarding the processing of your claim. The amount due is your financial responsibility. Thank you for using our laboratory.

004197 1/2

| Date | CPT Code * | Test Description | Charge | Insurance Discount | Insurance Paid | Medicare/ Medicaid Paid | Patient Paid | Patient Owes |
|---|---|---|---|---|---|---|---|---|
| 04/28/17 | 86038 | ANA SCREEN, IFA | $84.36 | | | | | |
| 04/28/17 | 82164 | ANGIOTENSIN I ENZYME | $140.61 | | | | | |
| 04/28/17 | 85652 | SED RATE,AUTOMATED | $37.12 | | | | | |
| 04/28/17 | 36415 | VENIPUNCTURE | $22.50 | | | | | |
| 04/28/17 | 86431 | RHEUM FACTOR (QN) | $58.49 | | | | | |
| 04/28/17 | 86140 | C-REACTIVE PROTEIN | $75.37 | | | | | |
| 04/28/17 | 86609 | S. RECTIVIRGULA | $346.20 | | | | | |
| 04/28/17 | 86606 | ASPERGILLUS AB | $80.89 | | | | | |
| 04/28/17 | 86001 | AUREOBASIDIUM PULLUL | $168.24 | | | | | |
| | | Continued on Next Page | | | | | | |

**Tax ID: 71-0897031    ICD Codes: R07.9**

Services Performed by: QUEST DIAGNOSTICS WEST HILLS WEST HILLS, CA
Services Performed by: QUEST DIAGNOSTICS/NICHOLS SJC SAN JUAN C SAN JUAN CAPISTRANO, CA
Services Performed by: QUEST DIAGNOSTICS LONG BEACH - WOODRUFF LONG BEACH, CA
* The CPT codes provided are for information purposes only, and are based on AMA guidelines without regard to specific payer requirements

Do not use address below:

## Laboratory Invoice

For services not included in your physician's bill

| Invoice Date: | Amount Due: | Due Date: |
|---|---|---|
| May. 31, 2017 | $190.03 | Jun. 21, 2017 |

| Invoice Number | Lab Code |
|---|---|
| 4985677775 | WHC |

Patient Name:
Responsible Party:
Date of Service:   April 28, 2017

Lab Results and Diagnosis Questions Must Be
Answered By Your Physician.

| Date | CPT Code * | Test Description | Charge | Insurance Discount | Insurance Paid | Medicare/ Medicaid Paid | Patient Paid | Patient Owes |
|---|---|---|---|---|---|---|---|---|
| 05/16/17 | | PAID BY INSURANCE | | | ($87.17) | | | |
| 05/17/17 | | ADJUSTMENT | | ($736.58) | | | | |
| **Tax ID: 71-0897031   ICD Codes: R07.9** | | | **$1,013.78** | **($736.58)** | **($87.17)** | **$0.00** | **$0.00** | **$190.03** |

Services Performed by: QUEST DIAGNOSTICS WEST HILLS WEST HILLS, CA
Services Performed by: QUEST DIAGNOSTICS/NICHOLS SJC SAN JUAN C SAN JUAN CAPISTRANO, CA
Services Performed by: QUEST DIAGNOSTICS LONG BEACH - WOODRUFF LONG BEACH, CA
* The CPT codes provided are for information purposes only, and are based on AMA guidelines without regard to specific payer requirements